IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

JONNIE D. COFFMAN                                                    PLAINTIFF

              v.                    Civil No. 09-3052

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                               DEFENDANT

## MEMORANDUM OPINION

        Plaintiff, Jonnie Coffman , brings this action under 42 U.S.C. § 405(g), seeking judicial

review of a decision of the Commissioner of Social Security Administration (Commissioner)

denying his claims for a period of disability and disability insurance benefits ("DIB") and

supplemental security income ("SSI") under Titles II and XVI of the Social Security Act

(hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the

court must determine whether there is substantial evidence in the administrative record to

support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

## I.      Procedural Background

        The plaintiff protectively filed his application for DIB and SSI in June 2006, alleging an

onset date of July 1, 2001, due to depression, emotional problems, and panic attacks.  (Tr. 82,

140-141, 175, 190, 195).  Following denials of his application at the initial and reconsideration

levels, plaintiff then made a request for a hearing by an Administrative Law Judge (ALJ).   (Tr.

34-37).  An administrative hearing was held on January 17, 2008.  (Tr. 10-33).  Plaintiff was

present and represented by counsel.

At this time, plaintiff was 28 years of age, possessed a high school education, and had completed one year of college.  (Tr. 12-13, 23, 82).  He had past relevant work ("PRW") experience as a stocker/cashier.  (Tr. 18, 49, 132-139, 175-178).

On December 18, 2008, the ALJ found that plaintiff's mood disorder was severe, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  (Tr. 44).  After partially discrediting plaintiff's subjective complaints, the ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform activities with no exertional limitations.  However, he found plaintiff to be moderately limited in his ability to appropriately interact with the public and to appropriately respond to usual work situations and routine work changes.  (Tr. 48).  With the assistance of a vocational expert, the ALJ found plaintiff could still perform work as a production worker, maid/housekeeper, and sewing machine operator.  (Tr. 50-51).

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on May 22, 2009.  (Tr. 1-4).  Subsequently, plaintiff filed this action.  (Doc. # 1).  This case is before the undersigned by consent of the parties.  Both parties have filed appeal briefs, and the case is now ready for decision.  (Doc. # 8, 9, 10).

## II.   __Applicable Law__

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  *Edwards v. Barnhart*, 314 F.3d

2

964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently.  *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § § 423(d)(3), 1382(3)(c).  A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

A.     **The Evaluation Process**

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past

relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

**III.    Evidence Presented**

Records indicate that plaintiff has a history of treatment for bronchitis, pneumonia, ear infections, sinus infections, tinea cruris, and hypovolemic shock.  (Tr. 339).

On April 5, 1991, plaintiff fell off his bike and slid on his side causing excoriation and abrasions to his right elbow.  (Tr. 335).  He also had a small abrasion to the right anterior superior iliac spine and a couple of abrasions on the palms of his hands.  Otherwise, neurologically and musculoskeletally, he was fine.  Dr. Tom Langston prescribed Silvadene dressings for his right elbow, to be changed four times per day.  (Tr. 335).

On August 14, 1995, plaintiff reported problems with crying spells.  (Tr. 334).  At this time, these episodes occurred in the setting of parental discipline and appeared to be motivated by secondary gain.  Dr. Langston performed a full mental status evaluation and found plaintiff to be normal.  His thought processes were normal and his activities reflected those of a normal teenage boy.  Knowing the family's socioeconomic background, he was highly suspicious that this was an attempt to obtain disability benefits for plaintiff, due to psychiatric complaints. Accordingly, he recommended that plaintiff be evaluated at Ozark Guidance Center.  (Tr. 334).

4

On March 8, 1999, emergency room records indicate that plaintiff was a belted passenger in a motor vehicle accident. (Tr. 305-308). Another vehicle struck the driver's side of the car, causing plaintiff to hit his left forehead. No loss of consciousness was reported. A head to toe exam was negative, except for a laceration above his left eyebrow. When the ambulance arrived at the scene, plaintiff was ambulating in the rain, smoking a cigarette. He initially said he was fine and refused transport. However, after signing the forms refusing treatment, he decided he needed to be evaluated as he was experiencing some "slight head pain." Records indicate that plaintiff was able to tell the emergency room nurse that his friend was pulling out of an intersection and apparently did not see the full-size Chevy pickup coming and pulled out in front of it. Plaintiff refused stitches so his laceration was closed via steri strips. (Tr. 305-308).

On September 14, 1999, plaintiff presented in Dr. Langston's office with complaints related to the accident he was in on March 8, although he could not remember the details of the accident at this time. (Tr. 327). He reported decreased concentration mentally, but could not provide an example. The only thing Dr. Langston could coerce from him was that he had difficulty with verbal skills in relation to reading and searching the internet. However, he continued to perform these tasks on a daily basis. At work, plaintiff reported difficulty remembering which items he had already stocked in his area. Dr. Langston stated that a brief period of amnesia at the time of the accident and a history of injury to the head did raise the possibility of concussion. However, it was unusual for him to be normal for approximately three months following the accident and then have these symptoms suddenly appear. He recommended that plaintiff be checked for metabolic changes first. Otherwise, he planned to have him seen by a psychologist. Dr. Langston had an honest conversation with him about

5

substance abuse and instructed him to avoid marijuana and alcohol for a minimum of three months before referring him for any psychological testing.  (Tr. 327).

On October 7, 2000, plaintiff was treated for non-cardiac chest pain radiating into his left arm and nausea.  (Tr. 301-304).  He stated that he had become weak while at work.  The doctor prescribed Gas X to be used as needed.  (Tr. 301-304).

On April 15, 2001, plaintiff complained of an ear ache.  (Tr. 299-300).  His left ear canal was red and inflamed.  Plaintiff was diagnosed with otitis externa and prescribed Keflex and Cortisporin Suspension.  (Tr. 299-300).

On May 24, 2001, plaintiff was referred to Vista Health by Dr. Causey. (Tr. 344-345). Plaintiff stated that he had been depressed quite a bit and had recently suffered a "breakdown of sorts."  He reported suffering from depression off and on most of his life, but stated that it had gotten worse over the previous month.  Plaintiff's sleep patterns had been more erratic, his energy low, he had no interest in things, he had experienced some suicidal thoughts, and he was experiencing problems with anxiety.  He also complained of memory problems since his car accident in 1999.  Plaintiff indicated that he was treated for anxiety at age 16 and was prescribed Ativan which helped with both the anxiety and his difficulty sleeping.  He admitted to drinking "a little bit every morning before he went to bed, to help him sleep (plaintiff worked from 10:00 p.m. until 6:30 a.m.).  Plaintiff also had a history of alcohol and marijuana abuse.  The doctor diagnosed plaintiff with major depression and assessed him with a GAF of 55.  He then prescribed a trial of Celexa and asked him to follow-up in one month. (Tr. 344-345).

On June 27, 2001, plaintiff reported that the medication was helping.  (Tr. 343).  He was less depressed and his mood was back to normal.  Plaintiff continued to have problems falling

AO72A
(Rev. 8/82)

asleep and reported waking up frequently.  His appetite was normal, but plaintiff was sleeping quite a bit.  Anhedonia and thoughts of suicide had also decreased.  Although he reported some anxiety occurring at work, plaintiff indicated that it was less frequent since he started the medication.  The doctor explained to him that the sleepiness was a side effect of the medication. Plaintiff was advised to continue the same medication dosage for another month.  (Tr. 343)

On July 23, 2001, plaintiff rescheduled his appointment with Vista Health.  (Tr. 343). Again on August 8, 2001, plaintiff called to reschedule.  (Tr. 343).

On August 9, 2001, plaintiff was treated for pharyngitis.  (Tr. 296-298).  He was prescribed Biaxin.  (Tr. 296-298).

On August 22, 2001, plaintiff stated that he had been depressed since his last visit.  (Tr. 342).  He drank "quite a bit" and missed a lot of work because of it.  Plaintiff reported drinking about ½ pint of hard liquor per day for a few days.  He stated that the depression had recurred around the end of July.  Plaintiff reported that his current mood was reasonably good.  Although the medication reportedly caused him to have strange dreams, plaintiff felt that the Celexa worked well.  However, plaintiff was currently out of medication.  Therefore, the doctor ordered plaintiff to restart Celexa and to follow-up in one month.  (Tr. 342).

On September 19, 2001, records from Vista Health indicate that plaintiff had been doing well since his last visit.  (Tr. 341).  He denied having any problems.  However, he did admit to some "recreational" drinking.  Plaintiff stated that he now knew when to stop.  He indicated that the Celexa was working well with no side effects.  Plaintiff did still wake up at night sometimes, but his appetite was normal and his energy level was good.  He reported that he actually felt like

AO72A
(Rev. 8/82)

getting out and doing "stuff."  The doctor advised him to continue taking his medication and to return to the clinic in two months. (Tr. 341).

On September 9, 2003, plaintiff underwent a mental status and evaluation of adaptive functioning exam with Dr. William Nichols, Psy.D.  (Tr. 214-218).  Plaintiff reported some hearing loss on the left side due to a perforated tympanic membrane.  It only affected his understanding of conversations when there was significant background noise.  His gait and posture were normal and his demeanor stilted and odd.  Plaintiff reported depression as his chief complaint, characterized by social withdrawal, lack of motivation, and lack of confidence in his ability to do things successfully.  He indicated that this complicated his ability to work because he experienced difficulty being around people and performing to expectation.  Plaintiff denied any physical or medical limitations and denied taking any prescription medications.

Plaintiff reportedly began experiencing depression during late adolescence, but his mood problems did not begin impacting his work until June or July 2001, when his symptoms worsened.  He stated that he had taken Celexa and Ativan as an adolescent.  Plaintiff contended that the Celexa kept him "more upbeat" and prevented him from getting in "as bad a mood for as long a time."  However, he had to stop taking it when he lost his job and could no longer afford it.  Plaintiff also recounted adolescent episodes of nervousness and uneasiness about "things."  Further, he admitted to two suicide attempts at age 12, when he cut his wrists, but stated he never truly had the intent to kill himself.  Plaintiff reported one period of outpatient psychotherapy as a teenager at Ozark Counseling Services ("OCS"), but did not perceive this to have been helpful.  He denied any further history of psychiatric treatment, both inpatient and outpatient.  When asked to describe his typical mood, he stated that it was usually somewhere

8

in between depressed and happy.  Others reportedly described him as calm and emotionless.
Plaintiff disclosed that he had only six close friends.  He felt nervous in groups of people, as he
was not certain what others would do, and was distrusting until he was able to get to know the
person well.

As a student, plaintiff made average grades and denied behavioral problems in school,
retentions, and special educational involvement.  After high school, he attended a vocational
school for three semesters, studying computers and electronics. Plaintiff disclosed that he had
last consumed alcohol the previous week, stating that he consumed alcohol approximately once
every two months.  He did, however, acknowledge alcohol abuse patterns in his past, indicating
that he had missed two weeks of work once while depressed and drunk.  Plaintiff also stated that
his last use of cannabis was several years prior, denying regular use of this or any other illegal
drugs.  He did admit to smoking one pack of cigarettes per day as well as smoking tobacco in a
pipe when he could not afford cigarettes.  Plaintiff stated that he did have a drivers license, but
stated he rarely drove due to a lack of transportation.  He denied difficulty navigating or with
confusion, but stated he usually took someone with him.

Dr. Nichols noted that plaintiff was cooperative, but solemn with scant affect or
demonstrable personality characteristics.  He maintained steady eye contact and unusual social
mannerisms that accompanied his atypical appearance and odd social mannerisms.  Plaintiff's
thought content was unusual, but not indicative of delusional thought, blocking, tangential
processes, or loosened associations.  At times, he expressed thoughts that seemed to have an
underlying suspicious tone, although he denied any paranoid or overtly suspicious thoughts.  He
did report infrequently hearing someone call his name, but this was always when he was in bed

9

and almost asleep.  Dr. Nichols indicated that this was suggestive of hypnogogic hallucinations rather than psychotic phenomena.  Plaintiff also reported feeling as though others were watching him, like "a rat in a cage type of feeling," but he had no understanding of why he felt that way. He acknowledged that his feelings did not sound rational, but stated they felt real.

Dr. Nichols concluded that plaintiff had good concentration and mental processing pace. His persistence was within normal ranges as well.  No cognitive limitations were noted.  His history and presentation were inconsistent with mental retardation.  The only area of adaptive functioning significantly below expectation was social skills.  Dr. Nichols diagnosed plaintiff with schizotypal personality disorder and assessed him a global assessment of functioning score ("GAF") of 63.  He opined that plaintiff needed social skills training to help him cope with the social requirements of employment, which could make a large impact on his performance.  Dr. Nichols stated there was no finding of a clinically significant depressive or mood disorder. Plaintiff could hear and remember instructions of moderate to detailed complexity as well as handle work pressure adequately.  Without skills training, Dr. Nichols believed plaintiff would likely struggle to interact and respond appropriately to co-workers, given his personality traits, and would lack assertiveness and eventually withdraw.  (Tr. 214-218).

On September 13, 2003, plaintiff complained of heart palpitations and chest pain with movement.  (Tr. 290-295).  He stated that it felt like he had pulled a muscle.  The doctor noted that plaintiff had consumed three cups of coffee that morning and was presently drinking a mountain dew.  Chest x-rays were negative and an EKG revealed a questionable accelerated arteriovenous.  Plaintiff was diagnosed with palpitations.  (Tr. 290-295).

10

On January 4, 2005, plaintiff was treated for two abscesses to the left side of his face. (Tr. 286-289). The abscesses were incised and drained and a pressure dressing was applied. Plaintiff was given injections of Rocephin and Vicodin. Dr. Barbara Ashe prescribed Keflex, Vicodin, and warm compresses. (Tr. 286-289).

On May 2, 2005, plaintiff sought emergency treatment for pain associated with insect bites over the groin. (Tr. 281-285). The type of insect responsible for the bites was unknown. Plaintiff reported both pain and itching in the area. The doctor noted that the surrounding bite area was red and inflamed. Dr. Johnny Smith diagnosed plaintiff with insect bites and cellulitis. He prescribed Bactriban ointment and Keflex. (Tr. 281-285).

On August 6, 2005, plaintiff was treated for fever and diarrhea. (Tr. 272-280). He also reported a dry non-productive cough. An examination was within normal limits. His lungs were clear with adequate air exchange. His abdomen was soft and non-tender. Chest x-rays were normal, as was a CT scan of plaintiff's brain. Dr. Janet Shapter diagnosed plaintiff with fever and diarrhea. She prescribed Tylenol and an Albuterol inhaler for his cough. Dr. Shapter also advised plaintiff not to smoke. (Tr. 272-280).

On August 10, 2005, plaintiff presented in the emergency room. (Tr. 262-271). He stated that he had felt as though he were going to pass out and began to notice numbness in his hands. Plaintiff reportedly became very weak and lightheaded without actually losing consciousness. His history was only positive for an isolated sore throat. He was also running a fever. At this time, the nurse noted that plaintiff had no emotional, spiritual, or cognitive needs that were apparent. Plaintiff did not appear acutely ill and was non-toxic. A physical examination was positive for acute tonsilitis. Neurologically, plaintiff was oriented in all three

11

spheres, responded appropriately to questions, had intact recent memory, exhibited normal speech volume and contact, and was able to express himself appropriately. A CT scan was normal with no evidence of mass lesions or midline shift. X-rays of his chest revealed clear lung fields and no loss of volume. Further, an EKG showed normal sinus rhythm, a normal axis, and no evidence of ischemia. Dr. Ashe diagnosed plaintiff with near syncope and acute tonsilitis. She prescribed Zithromax. (Tr. 262-271).

On August 29, 2006, plaintiff was evaluated by Dr. Stephen Harris, Ph.D. (Tr. 223-227). Plaintiff stated that he suffered from depression and panic attacks. He also reported hitting his head in an automobile accident when he was 19 or 20. Plaintiff indicated that he did not feel like doing anything, was tired, and slept a lot. When experiencing a panic attack, plaintiff described a tightness in his chest, heart racing, hands tingling, and a feeling of terror. Five to six years prior, plaintiff was treated on an outpatient basis at Charter Vista for his depression. He denied hospitalization. Plaintiff also reported being treated for his mental impairments in high school.

Plaintiff admitted to using alcohol "sometimes" and marijuana "once in a while." When questioned further, he confessed to using marijuana once a month. As for alcohol consumption, plaintiff stated he drank pretty heavily a few years prior, but only for a short time. Apparently the police were called to his home once, when he was drunk and out of control. However, plaintiff was not arrested. He also reported smoking a package of cigarettes per day.

Plaintiff appeared to be pleasant and relaxed throughout the evaluation. His stream of mental activity was vague to well organized under direct questioning. With regard to thought control, plaintiff stated that he sometimes heard things like an owl or multiple people talking, but could not make out what they were saying. He also admitted to feeling suspicious quite a

12

bit of the time.  His affect and mood appeared to be appropriate, but somewhat odd.  For the most part, his self concept was positive. Plaintiff reported being tired most of the time and staying to himself with little socialization.  He detailed difficulty going to sleep and nightmares of being chased that woke him up.  Plaintiff denied homicidal ideation, but admitted to some suicidal ideation in the past.  He reported no recent suicidal thoughts and no suicide attempts. Dr. Harris diagnosed plaintiff with cannabis abuse, depressive disorder not otherwise specified, and assessed him with a GAF of 53.  Socially, plaintiff was noted to get along with people for the most part, but to also be somewhat withdrawn.  He could be understood and communicate effectively for the most part.  Dr. Harris opined that plaintiff's adaptive functioning appeared to be lower than his intellectual level.  No limitations in physical development or concentration, persistence, or pace were found.  (Tr. 223-227).

On January 18, 2007, Dr. Vann Smith performed a neuropsychological evaluation of plaintiff.  (Tr. 252-255).  Records indicate that plaintiff presented with a history of slowly worsening neurocognitive and emotive symptoms including impaired recall/declarative memory, impaired attention to sequential detail, impaired concentration, affective lability, sleep pattern disturbance, word finding difficulty, and dysexecutivism.  Plaintiff described his overall health as "good."  Dr. Smith noted that plaintiff's history was positive for numerous closed head injuries with resultant Grade III concussion, the first of which occurred at age 13 (bicycle wreck). He sustained a second head trauma secondary to a motor vehicle accident at age 19, and at age 21 he fell in his apartment sustaining another head trauma with Grade II (possible III) concussion.  The aforementioned cognitive/emotive symptoms merged, according to plaintiff, following these injuries and have slowly worsened over the previous few years.  He also reported

13

experiencing some episodes of angry outbursts that had diminished somewhat recently. Plaintiff described some occasional olfactory hallucinations (sulfur). His history was positive for outpatient treatment for depression. Plaintiff acknowledged drinking "4-6" alcoholic beverages "one or two times a month." Dr. Smith then noted that any additional history was non-contributory.

A neurocognitive status examination revealed that plaintiff was oriented in all spheres, his memory was intact, his judgment and insight were intact, his affect was muted but flexible, his mood was mildly dysthymic, his narrative was fluent, and there was no evidence of an associational anomaly. No hallucinations or delusions were reported. Further, plaintiff denied suicidal or homicidal ideation, intent, plan, or impulse. Plaintiff's gait was slow and steady. Dr. Smith estimated his intelligence to be within the normal to bright normal range. He concluded that plaintiff's clinical history and mental status examination and neuropsychodiagnostic screening test profile data revealed a pattern of abnormal responses and pathgnomonic signs consistent with the presence of impaired brain function. The pattern of abnormal findings noted across plaintiff's neuropsychodiagnostic test profile was similar to that associated with traumatic brain insult and the residuals thereof. Dr. Smith opined that this was consistent with plaintiff's reported history of Grade II and III concussions over the course of a number of years. In his opinion, plaintiff was disabled. He then diagnosed plaintiff with non-psychotic cognitive dysfunction. (Tr. 252-255).

Dr. Smith also completed a mental RFC assessment. (Tr. 256-260). He assessed plaintiff with a current GAF of 45 to 50. Dr. Smith opined that plaintiff's prognosis was fair. He concluded that plaintiff would be unable to meet competitive standards with regard to

14

remembering work-like procedures; maintaining attention for two hour segments; maintaining regular attendance and being punctual within customary, usually strict tolerances; sustaining an ordinary routine without special supervision; completing a normal workday and workweek without interruptions from psychologically based symptoms; understanding, remembering, and carrying out detailed instructions; setting realistic goals or making plans independently of others; and, dealing with the stress of semiskilled and skilled work. Dr. Smith was also of the opinion that plaintiff's ability to understand and remember very short and simple instructions; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in routine work settings; deal with normal work stress; be aware of hazards and take appropriate precautions; travel in unfamiliar places; and, use public transportation would be seriously limited. Further, he believed plaintiff 's impairments would result in him missing about four days or work per month. He then stated that alcohol or drug use did not contribute to plaintiff's symptoms. (Tr. 256-260).

IV.     **Discussion**

Plaintiff contends that the ALJ's decision is not supported by substantial evidence because he improperly used plaintiff's failure to seek treatment as a basis upon which to deny benefits, failed to give plaintiff's treating physician the proper weight, improperly dismissed Dr. Vann Smith's opinion, and improperly determined plaintiff's RFC. We disagree.

When evaluating the credibility of plaintiff's subjective complaints the ALJ is required to make an express credibility determination detailing his reasons for discrediting the testimony. *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001). An ALJ may not disregard a

claimant's subjective complaints solely because the objective medical evidence does not fully support them. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir. 2004). However, the ALJ need not explicitly discuss each *Polaski* factor. *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir.2004). The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints. *Id.* Even so, the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged impairments and the evidence as a whole. *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

In the present case, plaintiff alleges disability due to cognitive dysfunction resulting from multiple head injuries, depression, emotional problems, and panic attacks. At the hearing, plaintiff testified that he fell off of his bicycle at age 13 and hit the back of his head, knocking him unconscious. (Tr. 16). Then, in 1999, he was involved in an automobile accident. (Tr. 15-16). According to plaintiff, he and a friend were "T-boned" and thrown across the road, causing him to strike his head and sustain another concussion. (Tr. 16). As a result, he claimed to have experienced memory problems and difficulty focusing. Plaintiff indicated that he oftentimes had to read a sentence or paragraph more than once to understand what he was reading. (Tr. 16-17).

16

We note, however, that the record is devoid of any evidence to indicate that plaintiff actually suffered a concussion at any point in his history. Medical records concerning the bicycle accident reveal that plaintiff fell on his side and sustained scratches and scrapes to his elbow, pelvis, and palms. (Tr. 335). It does not, however, state that he lost consciousness or sustained any type of head injury. Further, emergency room records made just after the automobile accident in 1999, indicate that plaintiff was walking around when the ambulance arrived. (Tr. 305-308). He had a small laceration above his eyebrow, but no other injuries were reported. Plaintiff initially denied transport to the ER, stating that he was fine. However, some slight head pain convinced him to go in and be checked out. Plaintiff denied any loss of consciousness and was able to tell the triage nurse the details of the accident. There was no evidence of a significant head injury, a concussion, or amnesia at this time. In fact, plaintiff's own mother even testified that she was unaware of any head injuries or concussions suffered by plaintiff. (Tr. 31). Further, she denied noticing any significant changes in plaintiff following the motor vehicle accident.

Several months later, plaintiff complained of decreased concentration, which he related to the accident. At this time, he also claimed not to remember the details of the accident. (Tr. 327). Dr. Langston found it odd that plaintiff would be fine at the time of the accident, but then suddenly suffer from amnesia and other symptoms suggestive of a concussion. Although he could not totally rule out the possibility of a concussion, he opted to have plaintiff checked for metabolic changes before referring him to psychologist. Given plaintiff's history of alcohol and marijuana use, he also told plaintiff he would need to stay drug and alcohol free for a period of at least three months before he would order this testing. There are no records showing that

17

plaintiff returned for further evaluation.  Had plaintiff's alleged mental deficits been as severe as alleged, we believe plaintiff would have returned for further evaluation.

Plaintiff also testified to experiencing severe depression with suicidal ideations.  (Tr. 21-22).  He stated that he had not sought mental health treatment or medication, though, because he did not have the money to do so.  (Tr. 22).  In reviewing the medical evidence before the court, the undersigned notes that plaintiff did seek some limited treatment for his depression during the relevant time period.  Records indicate that plaintiff was seen at Vista Health on only four occasions.  (Tr. 341-345).  At this time, he was prescribed Celexa, which he admitted was helpful.  *See Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir.1998) ("[i]mpairments that are controllable or amenable to treatment do not support a finding of disability, and failure to follow a prescribed course of treatment without good reason can be a ground for denying an application for benefits").  He did not, however, take the medication as prescribed and failed to seek out further mental health treatment after September 2001.  Instead, plaintiff self medicated with alcohol.

Medical evidence dated during the relevant time period also indicates that plaintiff received only conservative treatment for his mental impairments.  Plaintiff was treated via medication and outpatient therapy only.  No hospitalizations were reported and there is no indication in the record that plaintiff's treating doctor found plaintiff's condition to be disabling. *See Depover v. Barnhart*, 349 F.3d 563, 567 (8th Cir. 2003) (observing that none of the plaintiff's treating physicians offered an opinion that the plaintiff was disabled or made any statement or recommendation that he was unable to work at an SGA level).  In fact, in 1995, Dr. Langston stated that he was suspicious of plaintiff's motives for alleging mental complaints.

18

As for his contention that he failed to seek further treatment due to financial constraints, we are cognizant of the fact that "a failure to seek treatment may indicate the relative seriousness of a medical problem." *Shannon v. Chater,* 54 F.3d 484, 486 (8th Cir. 1995). However, it is for the ALJ to determine appellant's motivation for failing to follow prescribed treatment or seek medical attention. *Benskin v. Bowen,* 830 F.2d at 884 n. 1. In the present case, we can find no evidence to indicate that plaintiff attempted to avail himself of the indigent and/or low cost medical treatment facilities available in his area. *See Murphy v. Sullivan,* 953 F.2d 383, 386-87 (8th Cir. 1992) (rejecting claim of financial hardship where there was no evidence that claimant attempted to obtain low cost medical treatment or that claimant had been denied care because of her poverty); *Hutsell v. Sullivan,* 892 F.2d 747, 750 n. 2 (8th Cir. 1989) (noting that "lack of means to pay for medical services does not *ipso facto* preclude the Secretary from considering the failure to seek medical attention in credibility determinations.") (internal quotations omitted). While he contended that he could not afford the medication to treat his depression, we note that he admitted to abusing marijuana and alcohol and smoking a package of cigarettes per day. *See Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (holding that plaintiff's failure to forgo smoking three packs of cigarettes per day to help finance pain medication distracted from his allegations of disability). It seems clear to the undersigned that the plaintiff simply chose not to spend the financial resources he had on obtaining medical treatment and/or medication. As such, we do not find that his lack of resources justifies his failure to obtain medical treatment and/or follow a course of treatment.

AO72A
(Rev. 8/82)

Perhaps the most damaging, however, is the fact that plaintiff worked in at least three positions after his alleged onset date. Plaintiff worked as a stocker at Wal-Mart from 1998 until November 2001. (Tr. 18). He stated that he was fired from this job for missing too much work. Plaintiff testified that he became afraid to go to work because he was afraid of people. However, in 2002, plaintiff returned to work as a machine operator at Wabash for three months ending in November 2002. (Tr. 215). This job was reportedly lost due to absenteeism. He also worked at Tyson from March 2005 until early July 2005. (Tr. 24). We note that he was fired from Tyson, but not due to poor job performance or absenteeism. Plaintiff testified that he was fired after failing a drug test. He indicated that his test was positive for marijuana. (Tr. 19). *See* 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did. We will consider all of the medical and vocational evidence in your file to determine whether or not you have the ability to engage in substantial gainful activity."). Therefore, although none of the aforementioned work attempts constituted substantial gainful work activity, we do believe they evidence plaintiff's ability to perform some work-related activities. And, we believe that his last work attempt indicates that plaintiff's drug and alcohol problem was at least partly to blame for his inability to hold down a job.

His own reports concerning his activities of daily living also contradict his contention of disability. On paperwork submitted to the Administration, plaintiff stated that his daily activities consisted of taking care of his cats and dog, cleaning, doing laundry (as needed), reading, and watching television.  (Tr. 142). He indicated that he was capable of caring for his personal hygiene, preparing simple meals daily, cleaning, doing the laundry, taking out the trash, riding

20

in a car, paying bills, counting change, handling a savings account, using a checkbook/money orders, reading, writing, visiting friends at their home, and talking to friends on the internet. (Tr. 143-146). In 1996, he told Dr. Harris that he enjoyed reading, amateur radio, and computers. (Tr. 147). *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor). Further, plaintiff denied difficulty getting along with family, friends, or neighbors. Clearly these activities are inconsistent with a finding of disability due to depression, anxiety, and/or emotional problems.

Plaintiff's mother, Nelda Coffman testified on plaintiff's behalf. (Tr. 25). She indicated that plaintiff has panic attacks, generally stays in his room with the door shut, and does not want to communicate very much. (Tr. 26). Ms. Coffman stated that plaintiff had friends with whom he associated, but over the last couple of years he had stopped going to their homes. They did come to his home, though. According to Ms. Coffman, plaintiff pretty much just stayed at home. (Tr. 27). We note, however, that "an ALJ is not required to accept a statement from a witness who will benefit financially from a determination of disability." *See Roberson*, 481 F.3d 1020, 1026 (8th Cir. 2007). The record clearly establishes that plaintiff resided with his parents.

Therefore, Ms. Coffman would benefit, albeit it indirectly, from plaintiff's receipt of benefits. As such, we can find no error in the ALJ's evaluation of her testimony.

We must also review the ALJ's RFC assessment. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

The ALJ properly considered plaintiff's subjective complaints, the objective medical evidence, and the RFC assessments of examining consultants, and several non-examining, consultative doctors. On September 1, 2006, Dr. Jay Rankin, a consultative examiner, completed a psychiatric review technique form and a mental RFC assessment. (Tr. 230-248). After reviewing plaintiff's medical records, he diagnosed him with depression not otherwise specified and an affective disorder related to his substance addiction. Dr. Rankin concluded that plaintiff had mild restrictions with regard to activities of daily living, moderate difficulties in maintaining

22

social functioning, and mild difficulties in maintaining concentration, persistence, and pace. He also found plaintiff to be moderately limited with regard to completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, interacting appropriately with the public, responding appropriately to changes in the work setting, and setting realistic goals or making plans independently of others. No episodes of decompensation were noted. Dr. Rankin stated that plaintiff could perform work where the interpersonal contact is routine but superficial, the complexity of the tasks is learned by experience with several variables, the judgment required is within limits, and the supervision required is little for routine but detailed for non-routine tasks. (Tr. 230-248).

Dr. Nichols also evaluated plaintiff and concluded that he had good concentration and mental processing pace, his persistence was within normal ranges, he exhibited no cognitive limitations, and his history and presentation were inconsistent with mental retardation. (Tr. 214-218). The only area of adaptive functioning significantly below expectation was social skills. Dr. Nichols diagnosed plaintiff with schizotypal personality disorder and assessed him a global assessment of functioning score ("GAF") of 63.[1] He opined that plaintiff needed social skills training to help him cope with the social requirements of employment. In his opinion, plaintiff could hear and remember instructions of moderate to detailed complexity, as well as handle work pressure adequately. (Tr. 214-218).

---

[1] A GAF of 63 is indicative of "[s]ome mild symptoms (*e.g.*, depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TR 34 (4th ed. 2000).

Further, Dr. Harris conducted a mental evaluation of plaintiff and diagnosed him with cannabis abuse and depressive disorder not otherwise specified.  He concluded that plaintiff could get along with people for the most part, but was also somewhat withdrawn.  Plaintiff could be understood and communicate effectively, but his adaptive functioning appeared to be lower than his intellectual level.  Dr. Harris assessed plaintiff with a GAF of 53.[2]  No limitations in physical development or concentration, persistence, or pace were found.  (Tr. 223-227).

While we are cognizant of Dr. Smith's much more restrictive RFC assessment, we agree with the ALJ's determination that it is not supported by the overall evidence of record.  Although some limitation in social skills was noted by Dr. Nichols, the evidence of record does not establish that plaintiff was suffering from a disabling level of cognitive dysfunction.  We do note that Dr. Smith is a neuropsychologist, while the other doctors referred to are psychologists.  However, we also note that psychologists are qualified to evaluate a person's cognitive function, just as neuropsychologists are.  The same tests and evaluation techniques are available to both.  Neuropsychology is a specialized field of psychology that does require additional specialized training, but we do not find that this factor alone entitles Dr. Smith's opinion to great weight.  Unlike the other two psychologists in this case, Dr. Smith has an extensive history of finding every client referred to him to be disabled.  While we do not believe that Dr. Smith's opinion should be discounted in all cases, simply based on this history, the weight given his opinion should be determined on a case by case basis based on the evidence of record.  In the present

---

[2]GAF scores of 51-60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TR 34 (4th ed. 2000).

case, we do not find his opinion entitled to more substantial weight than the opinions of the other two psychologists.

We note that Dr. Smith examined plaintiff on only one occasion. *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (holding that the opinion of a consulting physician who examined the plaintiff once or not at all does not generally constitute substantial evidence). Further, Dr. Smith's report clearly states that plaintiff's clinical history was obtained from plaintiff. Medical records were reportedly requested, but none were received or reviewed prior to the preparation of his report. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (holding that opinion of consulting physician is not entitled to special deference, especially when it is based largely on claimant's subjective complaints). Dr. Smith relied heavily on plaintiff's report of sustaining multiple concussions. However, as previously noted, the record reveals that plaintiff hit his head on only one occasion. At that time, he reported no loss of consciousness and was able to tell the triage nurse the details of the accident. It was not until several months later that he suddenly could not remember what happened and began to complain of mental deficits. At that time, plaintiff's treating doctor even stated that it was odd for a person to be able to relay the events shortly after they occurred, but to suffer from a sudden onset of amnesia a few months later. He referred plaintiff for further evaluation, but there are no records to indicate that plaintiff followed through. In fact, aside from four visits to Vista Health in 2001, plaintiff sought no treatment for his alleged disabling mental impairments. As such, we believe the ALJ was correct in dismissing Dr. Smith's opinion as it was based largely on plaintiff's own subjective complaints and is not supported by the overall record.

25

Although plaintiff contends that he suffered from difficulty in remaining focused on tasks and was easily distracted, this contention is not supported by the medical evidence. We recognize that Dr. Rankin noted some moderate limitations in this area of functioning, but note that he did not actually examine plaintiff. His opinion was based solely on plaintiff's medical records, which contained plaintiff's own subjective complaints. Both Drs. Harris and Nichols, who actually examined plaintiff, concluded that his concentration, persistence, and pace were within normal limits. And, contrary to plaintiff's contention, there is no treating psychiatrist's statement that was disregarded by the ALJ. As previously noted, plaintiff was only treated at Vista Health on four occasions and received no treatment after September 2001. The record does not contain an assessment from a doctor or therapist employed with Vista Health. Further, we can find no records or assessment completed by a Dr. Austin.

We also note the fact that plaintiff performed some work after his alleged onset date, evidencing his ability to perform some work-related activity. It is also of significance that plaintiff was fired from his last job for failing a drug test, rather than for poor performance or absenteeism. Accordingly, we do not find that plaintiff's limitations in the area of concentration, persistence, and pace were as significant as reported.

The evidence does indicate that plaintiff had some limitations with regard to social skills and skills that would allow him to adequately respond to work situations and changes. Therefore, after reviewing the very limited medical evidence contained in the administrative record, the undersigned finds substantial evidence to support the ALJ's determination that plaintiff was moderately limited in his ability to appropriately interact with the public and to appropriately respond to usual work situations and routine work changes.

26

We next evaluate the testimony of the vocational expert.  Testimony from a vocational expert based on a properly-phrased hypothetical question constitutes substantial evidence.  *See Cruze v. Chater,* 85 F.3d 1320, 1323 (8th Cir.1996); *cf. Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994) (when hypothetical question does not encompass all relevant impairments, VE's testimony does not constitute substantial evidence to support the ALJ's decision). The ALJ's hypothetical question needs to "include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Id.* (citing *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir.1993)); *see also Morse v. Shalala,* 32 F.3d 1228, 1230 (8th Cir.1994).

The vocational expert testified via interrogatories that a person who was moderately limited in the ability to appropriately interact with the public and in the ability to appropriately respond to usual work situations and routine work changes, could perform work as a production worker, maid, and sewing machine operator. (Tr. 209-210).  After reviewing representative positions in each category, we find that these positions do not require significant social interaction with co-workers or the public and involve fairly repetitive tasks that do not provide for a great deal of change in work routine.  As such, based on all of the evidence of record, we find substantial evidence supports the ALJ's conclusion that plaintiff could perform these positions.

Plaintiff also contends that the definition of moderate limitations provided by the ALJ to the VE was improper as it does not match the definition of moderate as it is defined in Webster's Dictionary.  However, we do not find this to be a problem.  The term moderate has been consistently defined by the administration to mean more than a slight limitation, but still allowing the individual to perform in a satisfactory manner.  (Tr. 48). *See Roberson v. Astrue,*

AO72A
(Rev. 8/82)

481 F.3d 1020, 1024-1025 (8th Cir. 2007) (indicating the definition of moderate provided on

forms printed by the Administration) and *Lacroix v. Barnhart*, 465 F.3d 881, 888 (8th Cir. 2006)

(same).  As this was the definition of moderate provided to the VE and utilized by the VE in

rendering his opinion that plaintiff could still work, we find no error.

**V.    Conclusion**

Accordingly, having carefully reviewed the record, the undersigned finds substantial

evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision

should be affirmed.  The undersigned further finds that the plaintiff's Complaint should be

dismissed with prejudice.

DATED this 2nd day of September 2010.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)